LAPHAM-HICKEY STEEL CORPORATION, Plaintiff-Appellant, v. PRO-
TECTION MUTUAL INSURANCE COMPANY, Defendant-Appellee.

First District (3rd Division)   No. 1—92—3773

Opinion filed March 30, 1994.—Rehearing denied May 12, 1994.

Geoffrey G. Gilbert and William J. Cooney, both of McBride, Baker &
Coles, of Chicago, for appellant.

Shaun Baldwin and Dawn Midkiff, both of Tressler, Soderstrom, Ma-
loney & Priess, of Chicago, and Lawrence Zelle and Patricia St. Peter, both
of Zelle & Larson, of Minneapolis, Minnesota, for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

In this declaratory judgment action seeking a determination of the right to insurance coverage for environmental damage, plaintiff Lapham-Hickey Steel Corporation appeals the trial court's order which (1) granted summary judgment in favor of defendant Protection Mutual Insurance Company, finding that a provision in the policy requiring the filing of suit within 12 months of discovery was dispositive; and (2) denied partial summary judgment against plaintiff to defendant's duty to defend under the policy.

On appeal plaintiff raises two issues: (1) whether the 12-month suit limitation clause in the insurance policy barred plaintiff's action where no suit was ever filed; and (2) whether defendant's duty to defend arose from the circumstances relating to the contamination found on plaintiff's premises. In the alternative, plaintiff asserts that if no event had occurred to trigger defendant's duty to defend, then the trial court should have refused to decide the suit-limitation issue on the ground that it was not ripe.

We reverse and find that this action is not time barred by the 12-month suit limitation as applied in this case and that defendant's duty to defend was triggered by the threat of formal proceedings to impose liability on plaintiff for costs relating to the contaminated site.

In March 1985 plaintiff purchased a facility in St. Paul, Minnesota (hereinafter referred to as the site) and was not aware of any environmental problems at the site at the time of purchase. In April 1987 plaintiff entered into negotiations to sell the site.

About May 1, 1987, plaintiff received notice from Ecology and Environment, Inc., that it had been retained by the United States Environmental Protection Agency (EPA) to investigate and evaluate the site. About May 5, 1987, plaintiff received a report from Twin City Testing Corporation, an organization which had been retained by the prospective buyers of the site. The report indicated that there were potential environmental problems at the site.

On May 11, 1987, plaintiff gave written notice to defendant's agent (John Kegaly of T.J. Adams and Associates) about the pending EPA investigation and provided a copy of the Twin City Testing report.

In the summer of 1987, plaintiff was informed that the Minnesota Pollution Control Agency (MPCA) would assume primary responsibility for the site. In July 1987 plaintiff retained an environmental consulting firm (Yates & Auberle) to provide advice in connection with the pending investigation of the site conducted jointly by the EPA and the MPCA.

On October 14, 1987, plaintiff obtained, through a Freedom of Information Act request, a copy of the EPA technical report which had been completed the previous month, September 1987.

Also in October 1987, plaintiff received from the MPCA a draft consent decree stating that (1) surface and subsurface soils were contaminated; (2) there was a potential for ground water contamination; and (3) plaintiff was a "responsible person," *i.e.*, liable, under Minnesota statutes.

From December 1987 to January 1989, plaintiff's environmental consultants reviewed the EPA's findings, negotiated an agreement with the MPCA, conducted investigations of the site and issued a report to the MPCA. In December 1987, plaintiff's environmental consultants (Yates & Auberle) completed their review of the EPA report. For the next several months, plaintiff's environmental consultants met with the MPCA to reach an agreement whereby the MPCA would not seek entry of the October 1987 draft consent decree and, in return, plaintiff would conduct an investigation and assessment of the contamination at the site, subject to the approval of the MPCA. These negotiations resulted in a "no action" letter dated June 8, 1988, from the MPCA which also approved a work plan proposed by plaintiff whereby plaintiff, at its expense would conduct a remedial investigation of the contamination at the site. During the summer of 1988, work on this plan commenced. Plaintiff's environmental consultants prepared a report acknowledging the contamination but concluding that the origin of the contamination occurred sometime prior to 1962. This report was issued to the MPCA in January 1989.

From May 1988 to May 1989, plaintiff and defendant were in contact concerning the environmental claims. On May 18, 1988, plaintiff sent a letter to defendant advising defendant on "the status of the investigation." In June 1988 defendant requested further information from plaintiff. In January 1989 defendant arranged a meeting which was held in February 1989 to discuss plaintiff's claims. Defendant denied coverage on May 23, 1989.

On June 20, 1989, defendant agreed to extend the date for filing suit by plaintiff until January 1, 1990, with the following caveat:

"Subject to a reservation of all of its rights as may exist today and provided that suit is not presently barred by time, Protection Mutual Insurance is agreeable to an extension of the date for filing suit under its Policy 7113 to and including January 1, 1990. To the extent suit is barred by contract or other time limitations today, this extension of time is not applicable. Protection Mutual neither intends nor agrees by these extensions of time to revive any right or any action which might already be barred."

By a similar letter dated December 21, 1989, defendant agreed to extend the date for filing suit until March 30, 1990.

On March 14, 1990, plaintiff filed its complaint for declaratory judgment. An amended complaint was later filed on September 7, 1990.

On April 2, 1991, plaintiff filed a motion for partial summary judgment on the issue of defendant's duty to defend plaintiff against the contamination claims brought by environmental agencies.

Subsequently defendant filed a motion for summary judgment asserting that plaintiff's action was time barred because plaintiff failed to institute suit within the 12-month limitation period provided in the insurance contract.

On September 29, 1992, the trial court addressed the cross-motions for summary judgment and found that the 12-month limitation period began to run in January 1989 when plaintiff received a report from its environmental consultants (Yates & Auberle) acknowledging the existence of contamination at the site. The trial court reasoned that a formal claim with the insurer could not be filed until after an investigation into the nature and extent of the contamination. Based on the January 1989 date of the commencement of the limitation period and the March 1990 date of filing the complaint, the trial court concluded that the 12-month "suit limitation provision is dispositive; [plaintiff] did not vigorously pursue its claim."

Alternatively, the trial court further found that "even if the suit limitation periods were held to be unenforceable for unreasonableness or waived, no event has occurred which would invoke coverage under Section 5," relating to the duty to defend. The trial court then granted summary judgment in favor of defendant and denied plaintiff's partial summary judgment motion regarding defendant's duty to defend.

On appeal the parties first address the validity and interpretation of the 12-month suit limitation provision which states in full:

"21. No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this Policy, nor unless the same be commenced within twelve (12) months next after *discovery* by the Insured of the *occurrence* which gives rise to the *claim*, provided, however, that if under the laws of the jurisdiction in which the property is located such limitation is invalid, then any such claims shall be void unless such action, suit or proceedings be commenced within the shortest limit of time permitted by the laws of such jurisdiction." (Emphasis added.)

Plaintiff does not dispute the trial court's finding of January 1989 as the trigger date for the purpose of the commencement of the 12-month limitation period but asserts that the proper cut-off date for filing suit was March 30, 1990, based on the two extension agreements executed by defendant on June 20, 1989, extending the time for filing suit until January 1, 1990, and on December 21, 1989, extending the filing deadline until March 30, 1990. The trial court, plaintiff argues, ignored the extension agreements and thus miscalculated the relevant time period.

Alternatively, plaintiff asserts that (1) the 12-month limitation period is invalid under Minnesota law if the application of this limitation would bar the filing of this suit after October 1988 as contended by defendant, and (2) even if the limitation clause is valid, defendant either waived its right to enforce it or is estopped from enforcing it under Illinois law.

Defendant contends that the 12-month limitation was triggered between May 1, 1987 (when plaintiff learned that its site was the subject of an EPA investigation) and October 14, 1987 (when plaintiff obtained a site inspection report prepared by the EPA) because at some point during that time period plaintiff discovered the contamination which is the subject of its insurance claim. Thus, defendant maintains that the cut-off date could be no later than October 1988.

In light of its position that the relevant trigger date ranges from May to October 1987, defendant asserts that the June 1989 extension agreement does not apply because plaintiff's lawsuit was already barred in October 1988 and the agreement specifically provided that the extension period would apply only if the "suit is not presently barred by time."

An appellate court applies the *de novo* standard of review in determining the propriety of a summary judgment order. (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 102, 607 N.E.2d 1204; *Demos v. National Bank of Greece* (1991), 209 Ill. App. 3d 655, 659, 567 N.E.2d 1083.) Summary judgment is proper when the pleadings, depositions and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c).

■ Since the property at issue is located in Minnesota, the limitation provision of the insurance policy, as quoted above, requires that we look to Minnesota law for the validity and applicability of the limitation provision. Absent a specific statute to the contrary, suit limitation periods in an insurance policy are permissible but may not be applied in an unreasonable manner. (*Henning Nelson*

*Construction Co. v. Fireman's Fund American Life Insurance Co.*
(Minn. 1986), 383 N.W.2d 645, 650.) Limitation provisions must be
strictly construed against the party invoking them and such provi-
sions are not generally favored. (*Henning Nelson Construction*, 383
N.W.2d at 651.) Whether a limitation is reasonable must be
determined on a case-by-case basis. *Henning Nelson Construction*, 383
N.W.2d at 651.

In *Henning Nelson Construction*, the foundational wall of a
construction project collapsed on June 21, 1979, and eight different
reasons were attributed to the collapse of the wall. The plaintiff
insured filed its proof of loss the next day (June 22, 1979). The parties
disagreed over the content and dates of their ensuing discussions, but
the plaintiff, believing it had the backing of the insurer, proceeded to
reconstruct the wall. (*Henning Nelson Construction*, 383 N.W.2d at
649-50.) The defendant insurer later denied coverage on January 1,
1981, and the plaintiff filed suit on December 16, 1981, to contest the
denial of coverage. The Minnesota Supreme Court held that the 12-
month limitation provision in the insurance policy, measured from
June 1979 when the plaintiff filed its proof of loss to December 1981
when the plaintiff filed the lawsuit, was unreasonably short and thus
the plaintiff insured was not barred from bringing suit. *Henning Nel-
son Construction*, 383 N.W.2d at 651.

Defendant directs our attention to *L&H Transport, Inc. v. Drew
Agency, Inc.* (Minn. 1987), 403 N.W.2d 223, and *Minnesota Mutual
Fire & Casualty Co. v. North Lakes Construction, Inc.* (Minn. App.
1987), 400 N.W.2d 367, which we find distinguishable. In *L&H
Transport*, the claim stemmed from an accident where a concrete
beam fell off an insured's truck and shattered on July 22, 1982. The
plaintiff insured did not file suit until July 12, 1984. The Minnesota
Supreme Court held that the plaintiff insured had waived the
question of the reasonableness of the one-year limitation. (*L&H
Transport*, 403 N.W.2d at 226.) In a footnote, however, the court
observed that the one-year period was reasonable since the plaintiff
had presented its claim to the insurer which paid part of the claim,
leaving the plaintiff about nine months to initiate a suit. *L&H
Transport*, 403 N.W.2d at 226 n.1.

In *North Lakes Construction*, the Minnesota Appellate Court
found that a two-year period of limitations was not unreasonably
short where the insured had filed a timely proof of loss for water
damage to property due to freezing but had neglected his obligation
to pursue the loss even though the insured was a "very sophisticated
insurance agent and broker." (*North Lakes Construction*, 400 N.W.2d
at 369.) Moreover, the insured had over three months to commence

an action after the insurer denied the claim, but failed to initiate an action. *North Lakes Construction*, 400 N.W.2d at 370.

■ In the present case, the limitation provision specifically states that a suit must be commenced within 12 months "after discovery by the Insured of the occurrence which gives rise to the claim." The claim filed by plaintiff seeks reimbursement for the costs of defense, investigation and remedial measures expended by plaintiff regarding the contaminated site.

Unlike the occurrences which typically give rise to insurance claims, such as the obvious accident in *L&H Transport* and the fairly easily discernable loss in *North Lakes Construction*, the source of the claim in the present case emanates from underground contamination which went undetected for decades.

The date of discovery which triggers the 12-month limitation period is disputed. Plaintiff and the trial court consider the pertinent date to be the time when plaintiff received the report from its environmental consultants (January 1989) which, for the first time, provided the parties with an understanding of the extent of liability. Defendant, on the other hand, contends that the discovery date falls within the months of May to October 1987 based on plaintiff's receipt of notice that its site was the subject of a future EPA investigation (May 1987) and receipt of the subsequent initial report prepared by the EPA (October 1987).

We believe that defendant's position is untenable given the complexity of the matter, the need for investigation to determine what actual, rather than suspected, contamination exists, the time-consuming procedures involved in the environmental arena controlled by various State and Federal agencies, and the timely notice provided to defendant of the situation faced by plaintiff. The trial court recognized, and we agree, that latent environmental contamination, by its very nature, does not impart a consonant tie between its suspected existence and proof necessary for an insurance claim. The trial court found that

> "It is true, as [plaintiff] asserts, that the discovery of the environmental contamination is a unique situation in which there is no congruence between the time contamination is suspected and the time there is a provable claim or loss. A claim cannot be made until—after investigation into the nature and extent of the contamination. Here, although [plaintiff] clearly knew there was some contamination, it was not until they received the report from Yates and Auberle in January of 1989, that they were in a position to file a formal claim with their insurer."

Based on the January 1989 date of discovery and the two

extension agreements executed by defendant, we find that plaintiff filed its suit (March 14, 1990) within the agreed deadline of March 30, 1990.

Even assuming that a date outside the 12-month limitation period were appropriate, we would find that the 12-month limitation period was unreasonably short under the circumstances of this case. Moreover, defendant was aware of the environmental problems at the site as early as May 11, 1987, when plaintiff gave written notice to its insurance agent. From May 1988 to May 1989, defendant and plaintiff communicated with each other concerning the status of the situation and plaintiff periodically provided further information to defendant to satisfy defendant's various requests. After nearly one year of investigation, defendant suddenly denied coverage in May 1989. Less than one month later, plaintiff secured an extension agreement with defendant and a second extension agreement followed a few months later. Within 10 months from defendant's denial of coverage plaintiff filed the present cause of action.

■ Second, plaintiff asserts that the threat of formal proceedings by the Federal EPA and the MPCA triggered defendant's duty to defend under the third-party liability coverage in the policy. Plaintiff observes that liability under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) (42 U.S.C. §§ 9601(35), 9607(a) (1988)) can be imposed on an innocent buyer and therefore argues that such risk warrants protection by liability coverage. Plaintiff primarily relies on *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 535 N.E.2d 1071.

Defendant contends that no duty to defend exists under the language of its policy because (1) its policy is not a third-party liability policy; and (2) the groundwater at issue is real property, not "personal property of others" as limited in the policy, subsection 5.

Assuming that groundwater may constitute personal property as stated in the policy, defendant further contends that no defense obligation ever arose under subsection 5 of the policy because (1) plaintiff bears no current legal liability for the contamination of the groundwater since the contamination was caused by prior owners of the property and the MPCA issued a no-action letter to plaintiff; and (2) no lawsuit or enforcement action has ever been filed against plaintiff in connection with the contamination discovered at the site.

Alternatively, defendant maintains that plaintiff's claim would be precluded under the land exclusion and the contamination exclusion in the policy.

The policy states that defendant agreed to insure plaintiff

"against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." The specific provision at issue is included in Part A "Property Insured," subsection 5, and provides:

"Unless otherwise provided herein, this Policy covers the following property while on the described premises and within 1,000 feet thereof:

\* \* \*

5. Personal property of others in the custody of the Insured to the extent of the Insured's legal liability for physical loss or damage of the type insured against by this Policy. This Company further agrees to defend any suit against the Insured alleging liability for such damages on account thereof, even if such suit is groundless, false or fraudulent; but this Company may without prejudice, make such investigation, negotiation and settlement of any claim of suit as this Company deems expedient."

The Illinois Supreme Court enunciated the principles to be applied when deciding an insurer's duty to defend in *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926 (the insurers had a duty to defend or indemnify insured in underlying lawsuits arising out of insured's incorporation of asbestos-containing materials into buildings).

"To determine an insurer's duty to defend its insured, the court must look to the allegations of the underlying complaints. If the underlying complaints allege facts within or *potentially* within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent. [Citation.] An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within the policy's coverage. [Citation.] Moreover, if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy. [Citation.]

The underlying complaints and the insurance policies must be liberally construed in favor of the insured. \*\*\* All doubts and ambiguities must be resolved in favor of the insured." (Emphasis in original.) *Wilkin*, 144 Ill. 2d at 73-74.

The clear language of subsection 5 in the present case establishes a duty to defend on the part of the insurer for "any suit against the Insured" for the property damage specified in the policy. Subsection 5 is similar to policy provisions addressed in *Outboard Marine* and *Specialty Coatings* where the courts held that the insurers had a

duty to defend the insureds. The provision at issue in the comprehensive general liability policy in *Outboard Marine* stated that the insurer

"will pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of *** property damage to which this policy applies, caused by an occurrence, and the company [insurer] shall have the right and duty to defend any suits against the insured seeking damages on account of such property damage ***." *Outboard Marine*, 154 Ill. 2d at 109.

Similarly, the same type of policy in *Specialty Coatings* provided that the insurer

"shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent." *Specialty Coatings*, 180 Ill. App. 3d at 388.

In *Specialty Coatings*, the insured received a PRP ("potentially responsible person") letter from the Federal EPA for the costs of cleaning up a toxic waste site. The court held that the insurer "is obligated to defend actions contemplated by the PRP letter." (*Specialty Coating*, 180 Ill. App. 3d at 389; see *Ryan v. Royal Insurance Co.* (1st Cir. 1990), 916 F.2d 731 and *Professional Rental, Inc. v. Shelby Insurance Co.* (1991), 75 Ohio App. 3d 365, 599 N.E.2d 423 (discussion of the division which exists in the Federal and State courts on the impact of a letter from an environmental agency for insurance purposes).) The court found that

"It may be presumed that a 'potentially responsible party' responding to the USEPA's letter will be requested to undertake voluntarily such actions as the agency could choose to require through an action in the court. The fortuitous choice to first seek voluntary compliance instead of court action does not eliminate the specter of potential liability for cleanup costs and damages to be incurred by defendants. Indeed, it is the very threat of available formal legal action that is expected to motivate the recipient of a PRP letter into responding acceptably to the government's suggestions." *Specialty Coating*, 180 Ill. App. 3d at 389.

Similarly, in the present case, plaintiff received a draft consent order from the MPCA which stated that the site at issue was contaminated and that plaintiff was a "responsible party" under the applicable statute. Also similar to *Specialty Coating*, plaintiff voluntarily acted to negotiate with the MPCA to construct a work plan which would hopefully eliminate the need for litigation.

We believe that whether an insured receives notice of liability through a PRP letter as in *Specialty Coatings* or through a MPCA

letter in the present case, the result for purposes of an insurer's duty to defend is the same, *i.e.*, the insured is compelled to take measures to avoid or lessen its liability and such letter would trigger a duty to defend. To hold otherwise would ignore a strong public policy encouraging parties to seek to resolve contested issues through compromise and remediation. To suggest a contrary view would require insureds to refuse to cooperate with regulatory agencies encouraging governmental bodies to file actions ensuring that the insurer will be within the penumbra of insurance coverage.

Defendant alternatively argues that the contamination at issue is not covered by the insurance policy based on the exclusion provisions for land and contamination.

Under the heading "Property Excluded" the insurance policy states that it "does not insure against loss or damage to *** land, standing timber, growing crops, animals."

Plaintiff argues that the land exclusion is inherently ambiguous as applied to groundwater and it is unreasonable to construe, as a matter of law, drinking water within the definition of land. Drinking water is what is ultimately at stake in the MPCA's claim.

Under the topic "Exclusions" the insurance policy provides that it "does not insure against *** contamination, shrinkage or change in color, flavor, texture or finish, unless such damage results directly from other physical damage not otherwise excluded by this Policy."

Plaintiff argues that its claim may or may not arise solely out of excluded causes but until that question has been resolved, plaintiff is entitled to a defense. We agree.

Under the principles enunciated in *Wilkin*, defendant has a duty to defend even if the facts only bring the case potentially within the policy's coverage and even if only one theory of recovery is within the potential coverage of the policy.

Moreover, we are not persuaded to rule differently by the result in *Horning Wire Corp. v. Home Indemnity Co.* (7th Cir. 1993), 8 F.3d 587, which was presented to us as additional authority by defendant. In *Horning Wire*, the plaintiff discovered that cresylic acid was leaking from one of its underground pipelines, recognized the environmental danger and hired a waste-removal contractor to remove the contaminated soil. The court held that the defendant's insurance policy did not provide the plaintiff with coverage for the clean-up costs based on a land exclusion provision and found that the exclusion for land was an exception to the general coverage for damage to real property. The policy at issue in *Horning Wire* covered real property. In contrast, the policy in the present case concerns "personal property of others in the custody of the insured" which we

have accepted as including subterranean water flowing through the ground. We simply do not equate land and water.

For all the foregoing reasons, we reverse the order entered against plaintiff and remand the matter to the circuit court.

Reversed and remanded.

RIZZI and CERDA, JJ., concur.