2019 IL App (1st) 181945

SIXTH DIVISION
AUGUST 23, 2019

No. 1-18-1945

| | | |
|---|---|---|
| ILLINOIS TOOL WORKS, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 14 CH 20792 |
| ACE SPECIALTY INSURANCE COMPANY, NEW | ) | |
| HAMPSHIRE INSURANCE COMPANY, and | ) | |
| MARYLAND CASUALTY COMPANY, | ) | Honorable |
| | ) | Moshe Jacobius, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Harris concurred in the judgment and opinion.

## OPINION

¶ 1    The plaintiff-appellant, Illinois Tools Works, Inc. (ITW), filed a declaratory judgment

action in the circuit court of Cook County against the defendants-appellees, Ace Specialty

Insurance Company, New Hampshire Insurance Company, and Zurich American Insurance

Company[1] (collectively, the insurers). ITW sought a declaration that the insurers had a duty to

defend it from claims regarding environmental contamination. The circuit court granted partial

summary judgment in favor of the insurers, and ITW filed this appeal. For the following reasons,

we affirm the judgment of the circuit court of Cook County.

¶ 2                              BACKGROUND

_____

[1]Zurich American Insurance Company is the successor in interest by merger to Maryland
Casualty Company.

¶ 3     ITW is a diversified manufacturer headquartered in Glenview, Illinois. In 2001, ITW acquired Diagraph Corporation (Diagraph). Diagraph, along with its subsidiaries and related companies, manufactured stencils, stencil machines, ink, duplicators, and related products from 1947 to 2002 at various manufacturing facilities within a location in south central Illinois known as the Crab Orchard Site.

¶ 4     The Crab Orchard Site consists of approximately 44,000 acres of land and is the site of a former Illinois Ordnance Plant. Large-scale bombs and munitions were manufactured at the plant during World War II. After the war, the site was designated as a U.S. fish and wildlife refuge. The United States Fish and Wildlife Service also manages the site's manufacturing facilities.

¶ 5     In 1987, an investigation of the Crab Orchard Site identified certain areas that allegedly posed unacceptable risks to human health and the environment, due in part to the release of hazardous substances from the manufacturing facilities located at the site. The United States Environmental Protection Agency (EPA) subsequently listed the Crab Orchard Site as a National Priorities List Superfund Site.

¶ 6     The EPA divided the Crab Orchard Superfund Site into six separate "operable units."[2] One of the operable units is the Miscellaneous Areas Operable Unit (MISCA-OU). MISCA-OU contains a tract of land known as Site 36. The Crab Orchard Superfund Site's former wastewater treatment plant was located in Site 36.

¶ 7     In 1991, the United States government, through the EPA and several other agencies, began developing response initiatives to remediate the various hazardous operable units within

_____

[2]An operable unit is " 'a discrete action that comprises an incremental step toward comprehensively addressing site problems.' " *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 675 (7th Cir. 2014) (quoting 40 C.F.R. § 300.5 (2014)). Operable units are used " 'when phased analysis and response is necessary or appropriate given the size or complexity of the site.' " *Id.* at 665 (quoting 40 C.F.R. § 300.430(a)(1)(ii)(A) (2014)).

the Crab Orchard Superfund Site. The cleanup effort of Site 36 was mostly completed by 2006, and the United States government incurred costs in excess of $8.9 million.

¶ 8    In 1997, the EPA created a seventh operable unit to address additional releases of hazardous substances that were not included in the six original units. That unit is known as the Additional and Uncharacterized Sites Operable Unit (AUS-OU). Diagraph's manufacturing facilities were located within AUS-OU.

¶ 9                                    The Policies

¶ 10    Between 1974 and 1985, the insurers issued a series of general liability insurance policies to Diagraph, which are now applicable to ITW as Diagraph's successor (the policies). Each policy provides an identical duty to defend ITW against a "suit":

> "[T]he company shall have the right and duty to defend any suit against the insured seeking damages on account of *** property damage *** and make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after [the] applicable limit of the company's liability has been exhausted."

¶ 11                                The AUS-OU Mediation

¶ 12    In August 2004, ITW received a letter from General Dynamics Ordnance and Tactical Systems, Inc. (GD-OTS), providing notice of liability "with respect to environmental contamination at" AUS-OU. The letter explained that GD-OTS also had manufacturing facilities within AUS-OU and that it had entered into an "Administrative Order on Consent" with the United States. Through the "Administrative Order on Consent," GD-OTS agreed to pay for the

cleanup costs related to AUS-OU. The letter stated that ITW was a potentially responsible party because Diagraph's "activities at the AUS-OU have resulted in the release of hazardous substances into the soil and/or groundwater at the AUS-OU."

¶ 13     The letter invited ITW to participate in the remediation of AUS-OU and share the costs, but explained that if ITW declined to do so, GD-OTS would file a lawsuit against ITW. A draft complaint was attached to the letter.[3]

¶ 14     ITW agreed to participate in the remediation and entered into mediation with the United States in which the AUS-OU response costs would be allocated between ITW, GD-OTS, and other potentially responsible parties (the AUS-OU mediation).[4] ITW notified the insurers about the AUS-OU mediation and submitted its defense bills, but the insurers did not make any reimbursements to ITW regarding the AUS-OU mediation.

¶ 15                              The Site 36 Lawsuit

¶ 16     On May 12, 2011, the United States government filed a separate complaint against GD-OTS and Schlumberger Technology Corp. (STC),[5] seeking to recover the response costs incurred in cleaning up Site 36 (the Site 36 lawsuit). The Site 36 lawsuit alleged that Site 36 was contaminated by releases of hazardous substances from facilities within Site 36, including the wastewater treatment plant.

¶ 17     On June 1, 2012, GD-OTS and STC filed a third-party complaint against ITW, which sought contribution for the costs incurred in the remediation of Site 36. The complaint alleged that even though Diagraph's manufacturing facilities were located within AUS-OU, the

---

[3]The draft complaint was never filed.
[4]At the time of this appeal, the AUS-OU mediation remains ongoing.
[5]GD-OTS and STC are not parties to this appeal.

"activities of Diagraph resulted in the release and/or disposal of hazardous substances in Site 36" through the wastewater treatment plant.

¶ 18    The insurers funded ITW's defense in the Site 36 lawsuit. On April 1, 2014, the Site 36 lawsuit concluded pursuant to a consent decree. ITW agreed to pay GD-OTS and STC $166,666.67 to settle the third-party complaint.

¶ 19                                      The Instant Action

¶ 20    On December 30, 2014, ITW filed its complaint against the insurers in the instant action.[6] ITW's complaint sought a declaratory judgment that the insurers had a duty to defend and indemnify it for claims against it regarding both Site 36 and AUS-OU.[7]

¶ 21    Both parties moved for partial summary judgment on the issue of whether the insurers had a duty to defend ITW in the AUS-OU mediation. In their motion, the insurers acknowledged that they had a duty to defend ITW in the Site 36 lawsuit, but argued that the same duty did not apply to the AUS-OU mediation because it was not a "suit" pursuant to the policies.

¶ 22    On January 26, 2017, the trial court denied ITW's motion for partial summary judgment and granted the insurers' motion for partial summary judgment. In granting the insurers' motion, the trial court found that the AUS-OU mediation did not trigger the insurers' duty to defend because it was not a "suit." The court also stated:

> "Furthermore, the court finds that whatever defense obligations may exist on the part of the insurers with respect to [the Site 36 lawsuit] under the primary policies at issue, such defense obligations do not extend to the claims based upon the AUS-OU

[6]ITW also filed its complaint against Liberty Mutual Insurance Company. Liberty Mutual is not a party to this appeal.

[7]ITW's complaint brought other claims against the insurers, such as breach of contract, that are not at issue in this appeal.

area, because the pleadings in [the Site 36 lawsuit] do not raise even the potential for liability with respect to any part of the Crab Orchard Site other than Site 36.

***

ITW seems to suggest that the mere fact that wastewater may have been deposited into the sewer system at other sites, including perhaps sites within the AUS-OU area, means that the 'release into the environment' (and thus, arguably, the 'property damage' potentially covered under the policy) occurred at those other sites. That is not what the complaint in [the Site 36 lawsuit] alleges, nor would it be reasonable for the court to construe the underlying allegations in that way. The pleadings in [the Site 36 lawsuit] specify that the release into the environment occurred at Site 36, and include no factual allegations suggesting a release of hazardous materials anywhere else."

The trial court found that ITW had not presented any evidence demonstrating a link between the Site 36 lawsuit and the AUS-OU mediation. Accordingly, the trial court found that no genuine issue of material fact existed and concluded that the insurers had no duty to defend ITW in the AUS-OU mediation.

¶ 23    Afterwards, ITW moved for a Rule 304(a) finding as to the January 26, 2017, order granting partial summary judgment in favor the insurers and holding that the insurers had no duty to defend ITW in the AUS-OU mediation. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). The trial

court granted ITW's motion, finding that Rule 304(a) language would be "appropriate." In a written order, the court stated:

> "ITW's Motion for a Rule 304(a) finding as to the January 26, 2017 Order is GRANTED. The court issues Rule 304(a) language with respect to its January 26, 2017 finding that [the insurers] have no duty to defend ITW in the administrative proceeding and/or mediation regarding matters outside the scope of the pleadings in the [the Site 36 lawsuit]."

This appeal followed.

¶ 24                              ANALYSIS

¶ 25    Although the trial court's judgment granting partial summary judgment in favor of the insurers was not a final and appealable order, we still have jurisdiction to hear this matter because the trial court issued Rule 304(a) language to render the order appealable. Rule 304(a) "authorizes appeals from final judgments that do not dispose of an entire proceeding 'if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both.' " *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 23 (quoting Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)). A trial court's order invokes appellate jurisdiction merely through its explicit reference to Rule 304(a). *Rohr Burg Motors, Inc. v. Kulbarsh*, 2014 IL App (1st) 131664, ¶ 36. As the trial court here explicitly referenced Rule 304(a) in its order, and ITW then filed a timely notice of appeal, we have jurisdiction to consider this appeal. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016); R. 303 (eff. July 1, 2017).

¶ 26    The sole issue on appeal is whether the insurers have a duty to defend ITW in the AUS-OU mediation. The thrust of ITW's argument is that the insurers' duty to defend, which was

triggered by the Site 36 lawsuit, extends to the AUS-OU mediation. Specifically, ITW argues that the "claims of environmental damage" for both the Site 36 lawsuit and the AUS-OU mediation "arise out of the same alleged misconduct." ITW claims that Diagraph allegedly released hazardous materials into the sewer system from its facilities located in AUS-OU and that the wastewater treatment plant in Site 36 was "simply the destination where the sewer system throughout the Crab Orchard Superfund Site terminated." ITW avers that because the discharges involved in the Site 36 lawsuit originated in AUS-OU, the insurers have a duty to defend ITW in the AUS-OU mediation. ITW requests that this court reverse the trial court's judgment granting partial summary judgment in favor of the insurers.

¶ 27    The purpose of summary judgment is to determine if a question of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014); *Adams*, 211 Ill. 2d at 43. "Although summary judgment is to be encouraged as an expeditious manner of disposing of a lawsuit, it is a drastic measure and should be allowed only where the right of the moving party is clear and free from doubt." *Wells Fargo Bank, N.A. v. Norris*, 2017 IL App (3d) 150764, ¶ 19. We review appeals from summary judgment rulings *de novo*. *Id.*

¶ 28    The trial court in this case granted summary judgment on the issue of the insurers' duty to defend. A duty to defend is triggered by a specific comparison of the insurance policy provisions entered into by the parties with the allegations of the underlying complaint. *American Service Insurance Co. v. China Ocean Shipping Co. (Americas)*, 402 Ill. App. 3d 513, 521 (2010). When

construing an insurance policy, the court should first determine the intent of the parties when the insurance policy was drafted and construe the insurance policy in such a way that its construction mirrors that intent. *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 529 (1995). It is well settled that the term "suit" in an insurance policy is unambiguous, and "requires the commencement of some action in a court of law before an insurer's duty to defend is triggered." *Id.* at 531.

¶ 29    ITW does not dispute the fact that the AUS-OU mediation is not a "suit" under the terms of the policies. ITW even concedes that, on its own, the AUS-OU mediation does not trigger the insurers' duty to defend. Instead, ITW avers that the AUS-OU mediation is a continuation of the Site 36 lawsuit, and so the duty to defend from the Site 36 lawsuit extends the insurers' duty to the AUS-OU mediation.

¶ 30    In support of its argument, ITW directs us to *Benoy Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 287 Ill. App. 3d 942 (1997). In *Benoy*, the insureds sought a declaratory judgment that the insurer had a duty to defend them from environmental claims in both a lawsuit and a subsequent administrative action. *Id.* at 944. The trial court granted partial summary judgment in favor of the insurer and held that the insurer did not have a duty to defend the insureds in the administrative action because it was not a "suit." *Id.* at 946. On appeal, this court reversed. *Id.* We found that while the administrative action was not a "suit," it arose from "the same occurrence" as the lawsuit. See *id.* at 947. This court focused on the fact that the administrative action concerned contamination of the soil and that the lawsuit had already expressly alleged contamination of the same soil. *Id.* We found the two claims to be "one continuing action" which required the insurer to defend both. See *id.* at 946.

¶ 31   ITW's reliance on *Benoy* is misplaced in this case. In *Benoy*, the administrative action sought liability for claims that had *already been expressly alleged in the lawsuit*. That is not the situation in this case. The Site 36 lawsuit strictly alleged ITW's liability for the cleanup of *only Site 36*. As noted by the trial court, the Site 36 lawsuit did not contain a single allegation of any type of contaminant release in AUS-OU.

¶ 32   Furthermore, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 defines a "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22) (2012). The Site 36 lawsuit sought liability for contaminant releases from the wastewater treatment plant *into the environment* in Site 36. It was not concerned with contaminant releases from Diagraph's facilities *into a sewer system* in AUS-OU. Meanwhile, the AUS-OU mediation sought liability for different environmental contamination at AUS-OU that was not related to Diagraph's discharges into the sewer system. Further, the AUS-OU mediation does not involve any allegations regarding Site 36. Thus, the Site 36 lawsuit and the AUS-OU mediation did not arise out of the same occurrence.

¶ 33   Significantly, the insurance policies explicitly distinguish the terms "suit" and "claim." Our supreme court has recognized this important distinction when determining whether there is a duty to defend:

> "If the word 'suit' was broadened to include claims, in the face of
> policy language which distinguishes between the two, any
> distinction between these two words would become superfluous.
> [Citation.] The distinction the policy draws between suits and

claims must be respected." *Lapham-Hickey Steel Corp.*, 166 Ill. 2d at 533.

The insurance policies here provide a duty to defend only when there is a "suit," and it has been established that the AUS-OU mediation is neither a "suit" nor a continuation of the Site 36 lawsuit. To hold that the insurers have a duty to defend ITW in the AUS-OU mediation merely because it involves claims *related to* the Site 36 lawsuit would lead to an absurd result. The insurers do not have a duty to defend against a hypothetical lawsuit that has not yet occurred. Indeed, the reason ITW agreed to participate in the AUS-OU mediation was to resolve the AUS-OU claims *without a lawsuit*.

¶ 34    In sum, the allegations in the Site 36 lawsuit are different from the claims in the AUS-OU mediation. Therefore, the duty to defend triggered by the Site 36 lawsuit does not extend to the AUS-OU mediation. Accordingly, we affirm the trial court's judgment granting partial summary judgment in favor of the insurers.

¶ 35                               CONCLUSION

¶ 36    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 37    Affirmed.

## No. 1-18-1945

| | |
|---|---|
| **Cite as:** | *Illinois Tool Works, Inc. v. Ace Specialty Insurance Co.*, 2019 IL App (1st) 181945 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 14-CH-20792; the Hon. Moshe Jacobious, Judge, presiding. |
| **Attorneys for Appellant:** | Angela R. Elbert and Eric Y. Choi, of Neal Gerber & Eisenberg, LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Joshua A. Boggioni, of Hinkhouse Williams Walsh LLP, Karen M. Dixon, of Skarzynski Marick & Black LLP, and Frank Slepicka, of Cohn Baughman & Serlin, all of Chicago, for appellees. |