(No. 77404.

LAPHAM-HICKEY STEEL CORPORATION, Appellee, v. PROTECTION MUTUAL INSURANCE COMPANY, Appellant.

*Opinion filed May 18, 1995.—Modified on denial of rehearing October 2, 1995.*

Lawrence Zelle and Patricia St. Peter, of Zelle &

Larson, of Minneapolis, Minnesota, and Shaun McParland Baldwin and Dawn Midkiff, of Tressler, Soderstrom, Maloney & Priess, of Chicago, for appellant.

Geoffrey G. Gilbert and William J. Cooney, of McBride, Baker & Coles, of Chicago, for appellee.

Stephen D. Marcus and Mark J. Seplak, of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (Laura A. Foggan, John E. Barry and Michael L. Converse, of Wiley, Rein & Fielding, of Washington, D.C., of counsel), for *amicus curiae* Insurance Environmental Litigation Association.

JUSTICE HEIPLE delivered the opinion of the court:

Lapham-Hickey Steel Corporation (Lapham-Hickey) filed a declaratory judgment action in the circuit court of Cook County seeking a determination of its right to insurance coverage under an "all risks" insurance policy provided by Protection Mutual Insurance Company (Protection). Lapham-Hickey sought to recover defense costs associated with the investigation of environmental contamination at one of its facilities. The circuit court granted summary judgment in favor of Protection, finding that Lapham-Hickey failed to file the declaratory judgment action within the relevant time limitation provision of the policy and denied summary judgment in favor of Lapham-Hickey, finding that no suit had been filed against Lapham-Hickey sufficient to trigger Protection's duty to defend. The appellate court reversed, stating that Lapham-Hickey had alleged a valid and timely cause of action against Protection. (262 Ill. App. 3d 400.) We granted leave to appeal (145 Ill. 2d R. 315).

## BACKGROUND

Between approximately 1910 and 1956, the

Valentine-Clark Corporation operated a facility on Doswell Avenue in St. Paul, Minnesota. The Doswell facility was used for treating telephone poles with wood preservatives, including creosote, fuel oil and pentachlorophenol. The United States Environmental Protection Agency (EPA) has determined that Valentine-Clark's operations and waste disposal practices contaminated the surface and subsurface soils of the facility with polynuclear aromater hydrocarbons, pentachlorophenol and oil.

In March 1985, Lapham-Hickey purchased the Doswell facility without knowledge of the environmental contamination. In May 1985, Lapham-Hickey obtained a first-party all-risks insurance policy from Protection to cover the Doswell facility. The policy was delivered to Lapham-Hickey in Illinois and was effective from May 1, 1985, until May 1, 1988. The policy covered Lapham-Hickey against "all risks of physical loss or damage" to the property described in the policy, unless an exclusion applied. In its schedule of locations, the policy listed the Doswell facility along with other property located in Illinois, Missouri, Wisconsin, Indiana and Ohio. The policy required that any suit against Protection be commenced within 12 months after the occurrence which gave rise to the claim, if the 12-month period was reasonable under the law of the jurisdiction where the property was located.

In May of 1987, Lapham-Hickey received notice from Ecology and Environment that it had been retained by the EPA to investigate the Doswell facility as a possible candidate for placement on the "National Priorities List" under the Comprehensive Environmental Response Compensation and Liability Act (CERCLA). Several months later, Lapham-Hickey learned that the Minnesota Pollution Control Agency (MPCA) would be taking over the investigation of the Doswell facility.

In October of 1987, the MPCA sent Lapham-Hickey a proposed consent order. This draft order stated that surface and subsurface soils at the Doswell facility were contaminated, that there was possible groundwater contamination, and that Lapham-Hickey was a "responsible person." Under Minnesota law, a responsible person is "strictly liable" for "response costs and damages which result from the release or threatened release" of a hazardous substance. (9 Minn. Stat. Ann. § 115B.04 (West 1987).) The proposed order also required Lapham-Hickey to undertake a remedial investigation and feasibility study of the Doswell facility. Lapham-Hickey did not agree to or sign the proposed consent order.

Rather, between October 1987 and March 1988, Lapham-Hickey and its environmental consultants entered into negotiations with the MPCA. The negotiations resulted in a "no-action" letter being issued. The letter, dated June 8, 1988, stated that the MPCA had made no determination of whether Lapham-Hickey was a responsible person within the meaning of the Minnesota environmental regulations. The letter further stated that the MPCA did not believe that Lapham-Hickey was a responsible person with respect to the Doswell facility and that the MPCA staff did not intend to recommend any enforcement action against Lapham-Hickey as a responsible person. In the letter, the MPCA approved a work plan which Lapham-Hickey had submitted in respect to voluntarily conducting an investigation of the facility.

Lapham-Hickey's environmental consultants began an investigation of the facility in July of 1987 and the investigation continued after the "no-action" letter was issued. That investigation culminated in January of 1989 when the consultants submitted a report to Lapham-Hickey confirming the existence of contamina-

tion at the Doswell facility. The record does not indicate that the MPCA or the EPA made any further requests of Lapham-Hickey or initiated any enforcement action after the issuance of the "no-action" letter.

In March of 1990, Lapham-Hickey filed a declaratory judgment and breach of contract action against Protection, alleging that Protection owed a duty to reimburse Lapham-Hickey for the investigative costs it expended after the MPCA issued the proposed consent order. Both parties filed cross-motions for summary judgment. Lapham-Hickey claimed that Protection had breached its duty to defend. In its motion Lapham-Hickey stated that to date it had only incurred defense costs for experts and the services of counsel in responding to the proposed consent order and the "no-action" letter. Protection claimed that the instant declaratory judgment action had not been commenced within the 12-month suit limitation provision of the policy.

The trial judge granted Protection's motion for summary judgment and denied Lapham-Hickey's motion, finding that Lapham-Hickey was in a position to file suit when its environmental consultants submitted the report in January 1989. Since Lapham-Hickey did not file suit until over one year after it received the report, the 12-month suit limitation provision prohibited the suit. The trial judge also stated that even if the suit limitation period was unenforceable for unreasonableness, no "suit" had been filed which would invoke Protection's duty to defend under the policy.

On appeal, the appellate court reversed. (262 Ill. App. 3d 400.) The appellate court found that the 12-month suit limitation provision was unreasonable and that Lapham-Hickey had filed the suit within the applicable period of time. The court, relying on *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, also determined that

Lapham-Hickey's receipt of the proposed consent order from the MPCA was sufficient to trigger Protection's duty to defend. The appellate court declined to rule on whether Lapham-Hickey's claim arose out of certain policy provisions excluding land and contamination from coverage.

Before this court, Protection raises four bases for reversal: (1) whether groundwater is personal property of others so that the policy provides coverage; (2) whether a suit has been commenced against Lapham-Hickey sufficient to trigger Protection's duty to defend; (3) whether a contamination or land exclusion in the policy precludes Lapham-Hickey's claim; and (4) whether the appellate court erred in reversing the trial court's decision that this action was barred by the 12-month suit limitation provision. Due to our resolution of the second issue, we decline to reach the remaining issues.

## CHOICE OF LAW

Initially, this court must decide whose law to apply to the interpretation of the policy—Illinois' or Minnesota's. Often an insurance policy will contain an express choice of law provision. But in only two specific instances does the Protection policy even hint at choice of law, namely, that the law of the location/jurisdiction of the property should control (1) in determining whether the 12-month suit limitation provision was unreasonable and (2) in determining the effective time of the policy. The policy contains no other language controlling the choice of forum with respect to interpreting other provisions of the policy.

Absent an express choice of law, insurance policy provisions are generally "governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place

of performance, or other place bearing a rational relationship to the general contract." (*Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 528.) Two cases have specifically stated that an insurance policy is governed by the law of the State where the policy was issued or delivered or by the law of the place of the last act to give rise to a valid contract. *United States Fire Insurance Co. v. CNA Insurance Cos.* (1991), 213 Ill. App. 3d 568, 575; *Jadczak v. Modern Service Insurance Co.* (1987), 151 Ill. App. 3d 589, 593.

In the instant case, the record includes a memorandum in opposition to a motion to dismiss in which Lapham-Hickey asserts that the policy was delivered in Illinois. In addition, Lapham-Hickey is an Illinois corporation and Protection is licensed to do business in Illinois. The only connection which Minnesota has to this suit is that the Doswell facility is located there. Considering and weighing the several factors impinging on choice of law enunciated in *Hofeld*, we believe that Illinois law should apply to the interpretation of the policy. In so deciding, we take into account that the policy covers property in six different States, that it mentions two very specific and limited situations where the location of the property would determine the law to be applied, and that it is silent as to the choice of law for all other aspects of the policy. Therefore, to obtain a consistent interpretation of the policy and to reasonably apply Illinois choice of law principles, Illinois law must govern the interpretation of this policy.

## THE PROTECTION POLICY

The issue in this case is not who will pay for environmental cleanup at the Doswell facility, but the extent of Protection's contractual duties under the policy. The key consideration is whether the all-risks policy allows for reimbursement of the costs incurred by an insured who performs a voluntary investigation of a

potentially contaminated facility. Any costs which Lapham-Hickey expended in cleaning up the Doswell facility are not at issue in this case.

To determine whether the costs expended by Lapham-Hickey are covered under the policy, this court must first determine what provisions of the policy apply to the investigation of environmental contamination. The policy insured the following property while on one of the described locations listed within the policy:

"1. real property in which the Insured has an insurable interest;

2. personal property owned by the Insured;

3. personal property, other than motor vehicles, of officers and employees of the Insured;

4. personal property of others in the custody of the Insured, which the Insured is under obligation to keep insured for physical damage of the type insured against under this Policy;

5. personal property of others in the custody of the Insured to the extent of the Insured's legal liability for physical loss or damage of the type insured against by this Policy. This Company [Protection] further agrees to defend any suit against the Insured alleging liability for such damage, destruction or loss and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but this company may without prejudice, make such an investigation, negotiation and settlement of any claim or suit as the Company deems expedient."

The policy is a first-party property damage policy, which provides coverage for losses to Lapham-Hickey's own property. The only provision which could cover third-party property damage and which could require a duty to defend is the fifth provision. The parties admit that the fifth provision is the only possible basis for coverage of the investigative expenses incurred in identifying the groundwater contamination. Thus, we must determine whether the fifth provision requires Protection to compensate Lapham-Hickey for the costs it incurred when investigating the facility.

## CONSTRUCTION OF THE POLICY

Protection can avoid its duty to defend and to reimburse Lapham-Hickey for the defense costs if the language of the policy unambiguously shows that Protection did not contract to defend the actions Lapham-Hickey undertook in response to letters and a proposed consent decree issued from the EPA and the MPCA. Protection claims that it does not owe Lapham-Hickey a duty to defend, and thus reimburse it for the costs, because the policy requires that Protection defend against only "suits" and there has not been a suit filed against Lapham-Hickey. Lapham-Hickey, however, argues that although neither the EPA nor the MPCA has filed an actual suit against it, the draft consent order issued by the MPCA was a threat of formal legal action and was sufficient to constitute a "suit." Lapham-Hickey relies on the decision in *Specialty Coatings*, which held that a potentially responsible person (PRP) letter received from the EPA required an insurer under a comprehensive general liability policy to defend any actions contemplated by the letter. *Specialty Coatings*, 180 Ill. App. 3d at 389.

The construction of an insurance policy and its provisions is a question of law. (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 108.) A court must determine the intent of the parties when construing the policy. (*Outboard Marine,* 154 Ill. 2d at 108.) To determine "the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole [citations], with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract [citations]." (*Outboard Marine,* 154 Ill. 2d at 108.) A policy term is not ambiguous because the term is not defined within the policy or because the parties can suggest creative possibilities for its meaning. (See *Bruder v. Country Mutual Insurance Co.* (1993), 156 Ill. 2d 179,

193; *Central Illinois Public Service Co. v. American Empire Surplus Lines Insurance Co.* (1994), 267 Ill. App. 3d 1043, 1048.) In addition, a court cannot read an ambiguity into a policy just to find in favor of the insured. A policy provision is ambiguous only if it is subject to more than one reasonable interpretation. (*United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 74.) If a policy provision is unambiguous, however, a court must give the words of the provision their plain, ordinary and popular meaning. *Outboard Marine*, 154 Ill. 2d at 108.

The issue of when a "suit" exists in an environmental context is one of first impression before this court. Numerous Federal and State courts have decided the issue of whether a PRP letter issued by the EPA or similar correspondence from a State environmental agency constitutes a suit under a comprehensive general liability policy. Some courts have determined that the receipt of a PRP letter invokes an insurer's duty to defend. (See, *e.g., Aetna Casualty & Surety Co. v. Pintlar Corp.* (9th Cir. 1991), 948 F.2d 1507 (applying Idaho law); *A.Y. McDonald Industries, Inc. v. Insurance Co. of North America* (Iowa 1991), 475 N.W.2d 607; *Michigan Millers Mutual Insurance Co. v. Bronson Plating Co.* (1994), 445 Mich. 558, 519 N.W.2d 864; *Coakley v. Maine Bonding & Casualty Co.* (1992), 136 N.H. 402, 618 A.2d 777.) These courts have found the word "suit" to be ambiguous and given the word a broad definition in light of the perceived coercive impact of a PRP letter and the ability of the EPA to enforce strict liability in CERCLA actions. Other courts have taken a middle-of-the-road approach and determined that the word "suit" should be liberally interpreted in favor of the insured, but have then analyzed the facts of the case, including the coerciveness of any letters and the seriousness of the government effort, to determine if the receipt of a PRP letter

itself or a notification letter from a State agency invokes the insurer's duty to defend. (See, *e.g.*, *Ryan v. Royal Insurance Co. of America* (1st Cir. 1990), 916 F.2d 731; *Lapham-Hickey Steel Corp. v. National Surety Corp.* (1994), 259 Ill. App. 3d 974 (under the same facts as in the instant case, the court found that Lapham-Hickey was not subjected to a probable and imminent threat of governmental action sufficient to trigger the insurer's duty to defend); *Professional Rental, Inc. v. Shelby Insurance Co.* (1991), 75 Ohio App. 3d 365, 599 N.E.2d 423.) The final group of courts has found that the word "suit" is unambiguous and has given the word its plain meaning, which requires the commencement of some action in a court of law before an insurer's duty to defend is triggered; thus, the issuance of a PRP letter does not invoke the duty to defend. (*Ray Industries, Inc. v. Liberty Mutual Insurance Co.* (6th Cir. 1992), 974 F.2d 754; *Patrons Oxford Mutual Insurance Co. v. Marois* (Me. 1990), 573 A.2d 16; *City of Edgerton v. General Casualty Co.* (1994), 184 Wis. 2d 750, 517 N.W.2d 463.) Although these cases interpret the word "suit" within the meaning of a comprehensive general liability policy, their analysis is relevant to the definition of the word "suit" within the all-risks insurance policy at issue here. We agree with the third group of courts.

Provision 5 of the policy refers to both a "suit" and a "claim" within different contexts. Although the word "suit" is not defined in the Protection policy, the usage of the word is clear and unambiguous. Thus, the word must be given its plain and ordinary meaning. In common usage, the word "suit" refers to a proceeding in a court of law. Lay dictionaries define "suit" in reference to court proceedings. (See, *e.g.*, XVII Oxford English Dictionary 147 (2d ed. 1989) ("[t]he action of suing in a court of law *** litigation"); Webster's Third New International Dictionary 2286 (1986) ("an action or pro-

cess in a court for the recovery of a right or claim").) In conversations, the word "suit" is used to connote an attempt to gain the resolution of an issue within the court system. The primary attribute of a suit is that the parties to the action are involved in actual court proceedings. Thus, before Lapham-Hickey can claim that Protection has breached its duty to defend, a suit must have been filed against Lapham-Hickey. Since nothing has been filed against Lapham-Hickey in a court of law, there is no "suit" against which Protection can defend.

The definition of the word "suit" as requiring an action in a court of law is further supported by analyzing the connection between the filing of a complaint and the duty to defend. Whether an insurer's duty to defend has arisen is determined by looking to the allegations in the underlying complaint and comparing these allegations to the policy provisions. (*Wilkin Insulation*, 144 Ill. 2d at 72.) If the facts alleged in the underlying complaint fall within or even potentially within policy coverage, the insurer has a duty to defend its insured against the complaint. (*Wilkin Insulation*, 144 Ill. 2d at 72.) Thus, the duty to defend extends only to suits and not to allegations, accusations or claims which have not been embodied within the context of a complaint. In the instant case, a complaint alleging liability for property damage has never been filed against Lapham-Hickey. Without a complaint, there is no "suit." And without a "suit," Protection's duty to defend Lapham-Hickey is not triggered.

That the word "suit" refers to a proceeding in a court of law is also apparent by looking at the Protection policy itself. If all of the policy's language is to be given effect, then the words "suit" and "claim" as used within provision 5 must have different meanings. (See *Outboard Marine*, 154 Ill. 2d at 123 (court must strive to give every term meaning unless to do so would render

the term inconsistent or contradictory).) While Protection has the power to investigate any claim, it has the duty to defend only suits. If the word "suit" was broadened to include claims, in the face of policy language which distinguishes between the two, any distinction between these two words would become superfluous. (See *Ray Industries*, 974 F.2d at 762.) The distinction the policy draws between suits and claims must be respected.

Neither the initial letter from the EPA, the draft consent order nor the "no-action" letter initiated a suit. None were filed in a court of law and none accomplished service of process upon Lapham-Hickey. Rather, the draft consent order and ultimately the "no-action" letter were mechanisms used to encourage Lapham-Hickey to voluntarily investigate the contamination at the facility. Though the tone of these documents may have been confrontational, these documents by themselves are not complaints and do not impose liability.

Thus, Lapham-Hickey cannot recover the defense costs it expended in conducting the investigation of the contamination at the Doswell facility. The circuit court's denial of Lapham-Hickey's motion for summary judgment was proper.

For the reasons given, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

*Appellate court reversed;*
*circuit court affirmed.*