FOREST PRESERVE DISTRICT OF DU PAGE COUNTY, on Behalf of Itself and the County of Du Page, Plaintiff-Appellee, v. PACIFIC INDEMNITY COMPANY, Defendant-Appellant (Bellefonte Insurance Company *et al.*, Defendants).

First District (1st Division)   No. 1—94—0273

Opinion filed February 5, 1996.—Rehearing denied June 6, 1996.

Landau, Omahana & Kopka, Ltd. (Robert J. Kopka and Creed T. Tucker, of counsel), and Sedgwick, Detert, Moran & Arnold (Fred A. Smith and Timothy J. Barron, of counsel), both of Chicago, for appellant.

Chapman & Cutler, of Chicago (Richard A. Makarski and Kathleen R. Pasulka, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Pacific Indemnity Company (Pacific) appeals from an order of the circuit court of Cook County granting summary judgment in favor of plaintiff Forest Preserve District of Du Page County (District) in a declaratory judgment action. No other defendant is a party to this appeal.

The record on appeal indicates the following facts. The District is a municipal corporation that operated a sanitary landfill at the Roy C. Blackwell Forest Preserve in Du Page County from 1965 to 1973. The landfill was to be open for the deposit of general municipal waste, from which a hill was to be constructed for recreational purposes. The District itself did not deposit any waste in the landfill. In 1973, when the hill was completed, the District closed the landfill, covered the hill with dirt and seeded it with grass.

During the period from 1965 to 1973, Pacific continuously insured the District under annual general comprehensive liability policies. The policies issued before 1967 insured against accidents occurring during the policy period that caused property damage. The policies issued from 1967-73 insured against occurrences causing property damage during the policy period. All of the policies obligated Pacific to defend the District against any suit seeking damages on account of property damage. The policies also contained language excluding claims of damage to property owned, occupied or used by the insured.

In 1976, the District observed erosion of the landfill's cover dirt and apparent seepage of liquids from the interior of the hill to the surface. The District then added dirt to the hill, regraded the hill and constructed a number of containment trenches. In 1979, the District again observed erosion and seepage problems with the hill and again undertook remedial measures.

The District also hired an engineering firm to conduct a study of the landfill. In April 1980, the District received preliminary information from the firm, which eventually completed the study in April 1981. The study suggested that leachate was migrating from the site into the surrounding groundwater. The study also suggested that the firm had not detected any release of hazardous substances that would have brought State and Federal environmental laws into play. In 1980, the District retained a second engineering firm, which evaluated the hydrological conditions in the vicinity of the site and concluded that the landfill had not degraded the quality of the local groundwater. In 1982, the District began sampling the groundwater for hazardous substances and in fact discovered evidence of contamination. On February 24, 1984, after confirming that hazardous substances had reached the underground aquifer, the District notified the United States Environmental Protection Agency (USEPA) that hazardous substances had been "released" from the landfill.

On March 30, 1987, the District received correspondence from USEPA. The letter advised the District that the USEPA was investigating the circumstances surrounding the landfill and sought information regarding these circumstances from the District. The District provided all of the requested information and offered to fully cooperate with any risk investigation and feasibility study, as well as any necessary remedial action recommended by USEPA.

The District notified Pacific of the March 30, 1987, letter in a letter dated May 27, 1987. The District's letter stated that there was an "alleged occurrence" under one of the policies issued to the District. The letter further stated that

> "should a lawsuit arise out of the matters of which you have received notice today, you should appear, defend and indemnify the District ***."

On July 7, 1987, the District and the Du Page County Board (County) approved an intergovernmental agreement that required the performance of a "remedial investigation and feasibility study" (RI/FS) of the landfill. The District then informed the USEPA of the intergovernmental agreement. The County retained Donahue & Associates, Inc. (Donahue), an environmental engineering firm, to conduct the RI/FS of the site. However, the District later agreed to

limit the agreement due to concerns that the USEPA might not approve Donahue's work because the USEPA was not a party to the intergovernmental agreement. Consequently, Donahue was to complete only "Phase 1" of the project, which was limited to investigation of the existing data, identification of data needs and completion of a draft work plan for the site.

In a letter dated November 30, 1987, Pacific notified the District that it would decline coverage of any claim arising out of the matters in the March 30, 1987, letter. Pacific asserted that: (1) the matters in the letter do not describe an "occurrence" under the policies; (2) it was unclear whether any damage took place during the terms of the policies; (3) the disposal of hazardous waste and any resulting harm were expected or intended by the District; (4) the contamination did not constitute "property damage" as defined by the policies; and (5) a claim seeking compliance with the regulatory directives of the USEPA does not constitute a claim for damages. The District sent a critical response, dated December 17, 1987, to Pacific. On January 4, 1988, Pacific clarified that its earlier letter applied to policies issued from December 1, 1967, through December 1, 1976. Following another response from the District, Pacific returned to the position declining coverage under all of the policies at issue.

On June 24, 1988, the USEPA published a proposed rule in the Federal Register, proposing to place the landfill on the national priority list, also known as the Superfund list, which is a federally mandated list of waste facilities most in need of Federal attention. On August 15, 1988, the District filed a comment in opposition to the proposed rule with the USEPA. On September 8, 1988, Donahue completed "Phase 1" of its work, as contemplated by the District and the County.

In early May 1989, the District received a letter from the USEPA notifying the District that it was a potentially responsible party (PRP) with respect to the landfill. The "PRP letter" gave the District 60 days to coordinate with other PRPs and submit a "good faith" proposal for the landfill, which was to include the performance and implementation of an RI/FS. The PRP letter also stated that a "good faith" proposal should include "a paragraph-by-paragraph response to U.S. EPA's draft administrative order on consent." Otherwise, the USEPA would take further action, including the performance of the RI/FS. The PRP also scheduled a meeting between USEPA and the PRPs.

The District sent Pacific a letter dated June 5, 1989, demanding that Pacific defend the District against the claim made by the PRP letter and indemnify the District for the costs of any remedial ac-

tions that would have to be performed. The June 5, 1989, letter states that a copy of the PRP letter was enclosed. On July 13, 1989, Pacific sent the District a letter reiterating its prior position declining coverage.

On August 4, 1989, the District approved an "Administrative Order by Consent" for a RI/FS at the landfill. The order was approved by the Illinois Environmental Protection Agency (IEPA) on September 18, 1989, and by the USEPA on September 25, 1989. In February 1990, the landfill was placed on the national priority list.

On March 1, 1991, the District sent Pacific a letter advising Pacific that the District had undertaken an investigation of the landfill and describing the preliminary findings of the investigation. The letter further stated that the District would prepare a "White Paper" detailing the circumstances of the groundwater contamination and offering its views of the insurance issues involved. The letter further invited questions from the insurers.

On July 2, 1991, the District sent copies of this "White Paper" to all of its insurers. After summarizing the circumstances surrounding the landfill and surveying the theories applied in various jurisdictions to determine whether insurance coverage is triggered in environmental cases, the District's counsel wrote as follows:

> "Because of the various theories of trigger and the factual interpretation necessary to apply any one of those theories, the District and County must look to all comprehensive liability insurers having policies in effect during any time period when coverage could be 'triggered' by an 'occurrence' under any theory, i.e., 1979 through 1984. All carriers during that time period should participate in reimbursing the District for its past losses and future costs relating to the USEPA action. None are in any position to contest the reasonableness of any losses (including attorneys' fees) because each carrier has failed to meet its duty to defend the District and County in the Blackwell situation. If the carriers continue to disregard their obligations, a court will be asked to make an appropriate determination."

The "White Paper" also referred to *United States Fidelity & Guaranty Co. v. Specialty Coatings Co.* (1989), 180 Ill. App. 3d 378, 535 N.E.2d 1071, in which this court held that the insurer's duty to defend was triggered by a PRP letter and that the "sudden" and "accidental" pollution exclusion did not preclude coverage. A letter accompanying the "White Paper" notified the insurers that time limitations in some of the policies meant that the District would file suit against the insurers if they did not settle with the District by the end of July 1991.

Thereafter, the District filed a three-count complaint against Pacific and numerous other insurers, seeking declaratory and other relief. After receiving the District's motion for a default judgment, Pacific appeared and answered the complaint on March 13, 1992. The District filed a motion for summary judgment against Pacific on July 29, 1992. Pacific filed its own motion for summary judgment on September 9, 1992.

On October 19, 1992, the trial court granted summary judgment to the District. The trial court, relying on the *Specialty Coatings Co.* opinion, ruled that Pacific's duty to defend was triggered by the PRP letter and that Pacific's breach of the duty to defend estopped Pacific from asserting defenses on the coverage issues. Pacific filed a motion to reconsider, which was denied on February 4, 1993. The trial court found that there was no just reason to delay enforcement or appeal of these orders on December 16, 1993. Pacific filed a timely notice of appeal to this court on January 18, 1994.

■ Pacific contends that the trial court erred in ruling that Pacific had a duty to defend the District because the PRP letter was not a "suit" within the meaning of the Pacific policy. Generally, whether an insurer's duty to defend has arisen is determined by looking to the allegations in the underlying complaint and comparing these allegations to the policy provisions. (*United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 73, 578 N.E.2d 926, 930.) If the facts alleged in the underlying complaint fall within or even potentially within policy coverage, the insurer has a duty to defend its insured against the complaint. *Wilkin Insulation*, 144 Ill. 2d at 73, 578 N.E.2d at 930.

The construction of an insurance policy and its provisions is a question of law. (*Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 108, 607 N.E.2d 1204, 1212.) A court must determine the intent of the parties when construing the policy. (*Outboard Marine*, 154 Ill. 2d at 108, 607 N.E.2d at 1212.) If a policy provision is unambiguous, a court must give the words of the provision their plain, ordinary and popular meaning. *Outboard Marine*, 154 Ill. 2d at 108, 607 N.E.2d at 1212.

■ In *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.* (1995), 166 Ill. 2d 520, 655 N.E.2d 842, the subject of Pacific's motion to cite supplemental authority, our supreme court, while noting divergent views among various Federal and State courts, agreed with those courts that have held

> "the word 'suit' is unambiguous and have given the word its plain meaning, which requires the commencement of some action in a court of law before an insurer's duty to defend is triggered; thus,

the issuance of a PRP letter does not invoke the duty to defend." (*Lapham-Hickey*, 166 Ill. 2d at 531, 655 N.E.2d at 847.) The *Lapham-Hickey* court reasoned that this interpretation followed not only from the dictionary definition of the word "suit," but also from "the connection between the filing of a complaint and the duty to defend." *Lapham-Hickey*, 166 Ill. 2d at 532, 655 N.E.2d at 847.

The District argues that "fairness and equity clearly require that *Lapham-Hickey* be given prospective application." Generally, our supreme court's decisions apply retroactively to cases pending at the time the decision was announced. (*Lannom v. Kosco* (1994), 158 Ill. 2d 535, 538, 634 N.E.2d 1097, 1099.) The supreme court has inherent power to declare, however, that a decision will apply prospectively only. (*Lannom*, 158 Ill. 2d at 538, 634 N.E.2d at 1099.) In the past, when the supreme court has intended that a decision apply prospectively, it has expressly stated so in the opinion. See *Lannom*, 158 Ill. 2d at 538, 634 N.E.2d at 1099 (and cases cited therein).

The District argues that *Lapham-Hickey* satisfies the test for prospective application that our supreme court adopted in *Elg v. Whittington* (1987), 119 Ill. 2d 344, 518 N.E.2d 1232. However, in *Lannom*, the supreme court stated that it would decline to apply the *Elg* test to cases where the supreme court decided to follow the general rule and apply its decision retroactively, as well as prospectively. (*Lannom*, 158 Ill. 2d at 539, 634 N.E.2d at 1100.) The *Lapham-Hickey* opinion on its face applies to the litigants in the *Lapham-Hickey* case and contains no language limiting the opinion to prospective application. Accordingly, we conclude that the rationale of *Lapham-Hickey* applies to this case, as it was pending at the time *Lapham-Hickey* was decided. Consequently, Pacific did not breach its duty to defend based on the 1989 PRP letter.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is reversed and remanded for proceedings consistent with this opinion.

Reversed and remanded.

BUCKLEY and BRADEN, JJ., concur.