FRUIT OF THE LOOM, INC., Plaintiff-Appellant, v. TRAVELERS INDEMNITY COMPANY *et al.*, Defendants-Appellees.

First District (2nd Division)   No. 1—95—1869

Opinion filed September 17, 1996.—Rehearing denied November 21, 1996.

D'Ancona & Pflaum, of Chicago (Michael Quinn and Steven Baron, of counsel), and Anderson, Kill, Olick & Oshinsky, L.L.P., of Washington, D.C. (Michael Nardolilli, Lauren Sobel, and Lisa Barsoomian, of counsel), for appellant.

Haskell & Perrin, of Chicago (Daniel Caswell and Michael Warnick, of counsel), for appellee Transportation Insurance Company.

Altheimer & Gray, of Chicago (Jeffrey Kraus and Charles Valente, of counsel), and Coudert Brothers, of New York, New York (Seth Ribner, Theodore Snyder, Julie Mack, and C. Allen Garrett, of counsel), for appellee Travelers Indemnity Company.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

This appeal concerns environmental pollution at a plant Fruit of the Loom, Inc. (FOTL), formerly owned in Bridgeport, Connecticut. FOTL sought a declaratory judgment against defendants Travelers

Indemnity Company (Travelers) and Transportation Insurance Company (Transportation) for failing to defend it in connection with the subject pollution. Travelers and Transportation filed answers and affirmative defenses. Travelers also filed a counterclaim seeking a declaration that it had no duty to defend or indemnify FOTL.

Following cross-motions for summary judgment between Travelers and FOTL, the circuit court initially granted partial summary judgment for FOTL but, upon motion for reconsideration, vacated its earlier order and granted partial summary judgment for Travelers instead. Subsequently, the court granted summary judgment for Transportation as well. FOTL appeals.

The issues presented include whether (1) a "suit" was filed giving rise to the insurers' duties to defend; (2) defendants are estopped from raising noncoverage as a defense where the underlying action was settled before either defendant filed a declaratory judgment action; (3) defendants' "intentional damage" exclusions bar coverage; (4) FOTL breached its duty to notify; (5) defendants' "pollution exclusions" bar coverage; and (6) FOTL waived its extracontractual claims by not raising them on appeal. We need address only issue one, under point I of this opinion, and issue five, under point II of this opinion, for disposition of this appeal.

From the mid-1950s to the late 1970s FOTL, through a former subsidiary, Universal Manufacturing Corporation (Universal), operated a leased facility in Bridgeport (Bridgeport plant) to manufacture electrical capacitors. Universal used low-chlorinated liquid polychlorinated biphenyls (PCBs) to impregnate the capacitors. One such agent, Aroclor 1242, was used until approximately 1972; another, Aroclor 1016, was used until 1978. PCBs, dielectric compounds that increase the efficiency of capacitors, are essentially insoluble in water. The Bridgeport plant initially used 55 gallons of PCBs each week to impregnate its capacitors, which rose to approximately 2,000 gallons per week prior to its discontinued use of PCBs in February 1978.

Universal purchased the PCBs from Monsanto Company (Monsanto) which, as early as 1963, placed warning labels on its Aroclor products concerning toxicity, and distributed product bulletins informing customers of toxicity and safe handling of the product. In the late 1960s, Monsanto discovered PCBs' harmful effects on the environment of which it informed Universal in March 1969. Monsanto specifically advised Universal to keep all chemicals well contained and, subsequently, to exercise the highest degree of control in its storage of PCB products. In May of 1970, Monsanto began to label Aroclor 1242 with a caution stating "[e]xtreme care should be taken to prevent any entry into the environment through spills, leak-

age, use, disposal, vaporization or otherwise." Aroclor 1016 was similarly labeled. Monsanto's warnings about the dangers of PCBs also were placed on its shipping documents and invoices. In February of 1970, however, Monsanto notified Universal that low-chlorinated PCBs (less than 54%) "have not been found in the environment and appear to present no potential problem to the environment." Aroclor 1016 contained 42% chlorine. In July of 1971, Monsanto sent a product bulletin to Universal, urging that "every care should be taken by users of PCB-containing products to prevent entry into the environment." The bulletin proposed nine guidelines for users of PCBs to follow.[1]

The Bridgeport plant used large amounts of lower-chlorinated PCBs to impregnate the capacitors, about 1 million pounds each year. Some of these PCBs escaped from the capacitor impregnation room through the wood and steel flooring, down into the underlying oil reclamation room, where it leached into the concrete slab beneath the plant and leached through the concrete into the soil and groundwater beneath the oil reclamation room. The "source point" for this contamination was the capacitor impregnation area at the Bridgeport plant. It was an ongoing process.

A Universal foreman, Robert Delvy, testified that PCB drippage occurred all the time; it was an ongoing problem to keep certain areas clean. He later testified that the drippage occurred occasionally and that the drippage was always cleaned up because "it was slippery and somebody could fall." Universal used chipboard to absorb the oil and "spent tons of money trying to keep the floor in reasonably good condition." Some drippage soaked through a protective floor to the underlying wood floor and into the basement area. Delvy stated that during the early 1980s, Universal made several efforts to clean up the PCB contamination and that material from years before was contaminated, including wood, walls and floors.

Universal had stored PCB drums in its plant parking lot at one time; it excavated most of the parking lot in an effort to clean up PCB contamination. In the past, Universal poured PCBs into the sewer drains. Delvy "pumped probably 3[00] or 400 gallons right out an exhaust port of a vacuum pump out onto the driveway and down the street and [it] ran into sewer drains and [it] ran into the railroad viaducts on more than one occasion." Delvy poured PCBs into the external drains in the plant; he and "other people" did this as a practice for a time when he was young until he was stopped. In the 1960s, the practice of pouring PCBs into the sewer was discontinued.

---

[1]Ultimately, PCBs were banned by the federal government in 1978.

Delvy did not know whether the drippage of PCBs was causing property damage.

Despite Universal's precautionary measures, pipe leaks and overflows continually occurred in the impregnation area, for example, when "somebody forgot to put a clamp on a chamber door" or when a "bottom clamp was left open." When significant spills occurred, the employees used "speedy dry"; when lesser amounts spilled on the floor, the chipboard was "put there to soak it up." Employees often got PCB oil on their shoes and tracked the oil throughout the plant, which was "not specifically" cleaned up.

Although one Monsanto employee reported that the Bridgeport plant was very clean, other Monsanto employees were concerned about the spillage at the plant. A Monsanto report indicated that Universal was losing about "6$^1$/$_2$ lbs. per week out of vent lines." The report concluded that Universal was losing approximately one "tank car of Aroclor per year."

The Bridgeport plant was inspected several times prior to 1986. In 1976, the Connecticut Department of Environmental Protection (DEP) and the Federal Environmental Protection Agency (EPA) inspected the Bridgeport plant. They issued an abatement order which stated that Universal is "maintaining a condition which reasonably can be expected to create a source of pollution to the waters of the state." The order did not allege any contamination of the building, soil or groundwater, but ordered Universal to investigate all sources of PCBs associated with the manufacturing of capacitors and to institute any necessary procedures or modifications to ensure no contamination by PCBs. Universal was required to submit a report detailing the use and disposal of PCBs.

A 1981 EPA inspection report cited Universal for several violations including improper disposal and storage of PCBs and labeling and recordkeeping of PCB containers.

On November 17, 1982, DEP inspected the Bridgeport plant in order to verify the findings by EPA one year earlier. In its report, DEP noted a "4' x 15' spill next to the flood tank," as well as "numerous spills throughout the processing section of the facility." DEP sampled the spills to determine the presence of PCB. The report noted the "spillage might be DOP," a non-PCB fluid. DEP also cited Universal for failing to keep proper dating and recordkeeping of PCBs. The report also noted another extensive spill of waste oil but indicated that the oil was DOP.

On February 1, 1983, DEP conducted another inspection of the facility. In August of 1983, EPA sent Universal a notice of noncompliance, relating to the 1982 and 1983 inspections. The notice of

noncompliance stated that Universal had improperly stored PCB "drums in the basement of your facility where the masonry walls had small cracks and the floor had an opening which may permit spilled PCB fluid to flow from the storage area." DEP's report of 1982 noted that it concurred in the findings concerning the basement area but the inspectors were unable to find an "opening" noted in the 1981 report.

In 1986, FOTL sold Universal and its interest in the Bridgeport plant to MagneTek. A Connecticut statute known as the "Transfer Act" required a seller of corporate realty to certify to both DEP and the buyer that either (1) there is no contamination on site, or (2) one of the parties to the sale agrees to be responsible for any clean up of the site. On January 29, 1986, FOTL certified to DEP that FOTL would remain responsible for the economic consequences of any remedial action. The certification stated that the Bridgeport plant "utilized PCB until 1978" and that, despite "prior cleanup efforts, residual PCB contamination from pre-1978 activities has recently been discovered." FOTL also certified that it would remove any hazardous waste at the Bridgeport plant "in accordance with procedures and a time schedule approved by the Commissioner of Environmental Protection pursuant to an order, stipulated judgment, or consent agreement."

In the spring of 1986, Universal retained Memphis Environmental Center (Memphis) as environmental manager at its Bridgeport plant. Memphis became responsible for managing all issues concerning PCB contamination. Memphis advised DEP of remedial plans at the Bridgeport plant in the summer of 1986, which remedial measures were implemented in order to "minimize employee exposure to surface and airborne PCB contamination." On November 19, 1986, FOTL submitted a report to DEP "summarizing the results of in-plant and soil and groundwater data collection, and recommend[ed] a phased approach to remediation at Universal."

On September 4, 1986, DEP conducted an inspection, pursuant to FOTL's certification of transfer, and discovered PCB contamination at the Bridgeport plant. The inspection, according to a later 1986 DEP letter to Universal from Scott Deshefy, DEP's PCB coordinator, a PCB investigation "was conducted as an extension of an investigation, voluntarily initiated by Universal Manufacturing Corporation, to determine the extent of PCB contamination resulting from past manufacturing of small, low-voltage capacitors impregnated with PCBs."

FOTL's director of insurance, Burgess D. Ridge, received a copy of the 1986 DEP letter on March 17, 1987. Ridge concluded that

there was a claim under the terms of its insurance policies and reported the letter to Travelers and Transportation on March 19, 1987. Ridge did not believe that Farley, Universal's parent, was entitled to a defense from the insurers until "it was established that there was a property damage claim that required defense." Ridge did not think that a property damage claim existed in the fall of 1985.

On April 22, 1987, Travelers acknowledged receipt of Ridge's letter of March 19, 1987, notifying Travelers of DEP's letter. On July 2, 1987, Travelers sent Ridge a questionnaire in order to determine whether the insurance policies issued afforded coverage. The Travelers' letter noted, among other things:

> "Please be advised that Comprehensive General Liability insurance responds to liability arising out of an 'occurrence' resulting in 'bodily injury' or 'property damage' during the policy periods. This type of policy may also contain language excluding coverage for damages arising out of any emission *** of any liquid *** or pollutant that is either expected or intended from the standpoint of the insured ***."

Both Travelers' letters reserved all rights and provided that neither the acknowledgement nor any investigation "shall be construed as a waiver of any of the rights and defenses available to The Travelers."

On June 21, 1988, FOTL negotiated a consent order with DEP, requiring FOTL to (1) continue investigating PCB contamination resulting from past manufacturing practices of Universal; (2) minimize any threat to human health and/or the environment; and (3) obtain discharge permits as necessary for any "discharge to the waters of the State resulting from implementation of remedial measures." The consent order established a three-phase schedule for remediation of the site and concluded that failure to comply subjects FOTL "to penalties under Section 22a—438, 22a—469, and injunction under Section 22a—435 of the Connecticut General Statutes."

A soil removal component report prepared for Universal in 1993 stated that "5,432 tons of contaminated materials were removed from the Site as a result of completing the soil removal component of the final phase of remediation at the Site. It is estimated that approximately 17,000 kilograms (or 37,478 pounds) of PCBs were removed from these materials."

FOTL's predecessors in interest purchased primary comprehensive general liability insurance policies from Travelers from January 1, 1965, to October 31, 1978, and from Transportation from November 1, 1978, to January 1, 1986.

The Travelers' policies from 1965 to September 30, 1971, did not contain a pollution exclusion provision. The Travelers' policies from

October 1, 1971, to October 31, 1978, excluded coverage under the following circumstances:

"(a) if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any insured or any person or organization for whose acts or omissions any insured is liable, or

(b) resulting from or contributed to by any condition in violation of or non-compliance with any governmental rule, regulation or law applicable thereto ***."

The Travelers' policies from January 1, 1965, to September 30, 1973, contain the following "intentional damage" exclusion:

"*Exclusions*. Part I of this agreement does not apply:

* * *

(d) to bodily injury, injury arising out of discrimination, advertising injury or property damage caused intentionally by or at the direction of the Insured unless committed for the purpose of protecting persons or property ***."  ·

The Travelers' policies issued after 1973 amended the above "intentional damage" exclusion to create the following "expected or intended" exclusion:

"*Exclusions*. Part I of this agreement does not apply:

* * *

(d) to bodily injury, injury arising out of discrimination, advertising injury or property damage which was either expected or intended from the standpoint of the insured ***."

Transportation's policies contain the following pollution exclusion provisions:

"*Exclusions*. Part I of this policy does not apply:

* * *

(i) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

FOTL initially filed a complaint for a judicial declaration that Transportation and Travelers were liable for all costs incurred in connection with pollution conditions at the Bridgeport plant. FOTL's complaint also contained counts for breach of the covenant of good faith, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1994)), and violation of the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 1994)). Thereafter, FOTL filed an amended complaint, to which Travelers

and Transportation filed answers and asserted affirmative defenses. Travelers also filed a counterclaim against FOTL, seeking a declaration that Travelers did not have a duty to defend or indemnify FOTL. FOTL subsequently filed a motion for partial summary judgment on the duty to defend against Travelers and sought to bar Travelers from asserting several affirmative defenses.

On January 11, 1993, the circuit court granted FOTL's motion for partial summary judgment against Travelers for breaching its duty to defend.[2] FOTL moved again for a partial summary judgment against Travelers, seeking to bar Travelers from asserting any remaining defenses. Travelers moved the court to reconsider its January 11, 1993, ruling estopping Travelers from asserting certain defenses, relying upon *Sears, Roebuck & Co. v. Seneca Insurance Co.*, 254 Ill. App. 3d 686, 627 N.E.2d 173 (1993). Travelers also cross-moved for summary judgment based upon its "pollution exclusion" defense. On June 6, 1994, the circuit court granted Travelers' motion to reconsider, vacated its earlier order and granted Travelers' cross-motion for partial summary judgment.

FOTL thereafter moved the circuit court to certify two questions for interlocutory appeal. Travelers again moved for summary judgment, seeking dismissal of FOTL's entire action based upon its "expected or intended" and late notice defenses. Transportation also moved for summary judgment based upon its "pollution exclusion." FOTL cross-moved against both defendants. Following a hearing, the circuit court granted Travelers' and Transportation's motions for summary judgment and denied all plaintiff's motions. This appeal followed.

I

FOTL initially argues the circuit court erred in ruling as a matter of law that defendants have no duty to defend. Travelers and Transportation maintain that *Lapham-Hickey Steel Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 655 N.E.2d 842 (1995) (*Lapham-Hickey*), governs the disposition of this case.

A

A motion for summary judgment will be granted only when the pleadings, depositions, admissions, and affidavits on file, if any, show

---

[2]On February 4, 1993, the circuit court entered an amended order which similarly granted FOTL partial summary judgment against Travelers for breaching its duty to defend and barring Travelers from raising its tenth, eleventh, twelfth and twentieth affirmative defenses.

that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005 (West 1994). A court may draw inferences from undisputed facts but will not grant summary judgment unless those facts are susceptible of only a single inference. *Bellerive v. Hilton Hotels Corp.*, 245 Ill. App. 3d 933, 935-36, 615 N.E.2d 858 (1993). This court reviews summary judgment orders *de novo*; accordingly, we examine all the evidentiary material on file at the time of the entry of the orders appealed from in the light most favorable to the nonmovant. *Trevino v. Flash Cab Co.*, 272 Ill. App. 3d 1022, 1025, 651 N.E.2d 723 (1995).

■ Insurance contracts are subject to the same rules of construction as other types of contracts. *Dunlap v. Illinois Founders Insurance Co.*, 250 Ill. App. 3d 563, 568, 621 N.E.2d 102 (1993). In construing a contract, the primary objective is to effectuate the intent of the parties. *Dunlap*, 250 Ill. App. 3d at 568. "Intent may be ascertained from the circumstances surrounding the issuance of the policy, including the situation of the parties and the purpose for which the policy was obtained." *Dash Messenger Service, Inc. v. Hartford Insurance Co.*, 221 Ill. App. 3d 1007, 1010, 582 N.E.2d 1257 (1991).

An insurer may not justifiably refuse to defend an action against its insured unless it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. *Conway v. Country Casualty Insurance Co.*, 92 Ill. 2d 388, 393, 442 N.E.2d 245 (1982). The duty to defend arises even if only one of the theories of recovery is within the potential coverage of the policy. *Shell Oil Co. v. A C & S, Inc.*, 271 Ill. App. 3d 898, 904, 649 N.E.2d 946 (1995).

■ In *Lapham-Hickey*, the supreme court determined "when a 'suit' exists in an environmental context." *Lapham-Hickey*, 166 Ill. 2d at 530. The *Lapham-Hickey* court noted that "the word 'suit' refers to a proceeding in a court of law [citations]" and observed, in part, as follows:

> "The definition of the word 'suit' as requiring an action in a court of law is further supported by analyzing the connection between the filing of a complaint and the duty to defend. Whether an insurer's duty to defend has arisen is determined by looking to the allegations in the underlying complaint and comparing these allegations to the policy provisions. [Citation.] If the facts alleged in the underlying complaint fall within or even potentially within policy coverage, the insurer has a duty to defend its insured against the complaint. [Citation.] Thus, the duty to defend extends only to suits and not to allegations, accusations or claims which have not been embodied within the context of a complaint. In the

instant case, a complaint alleging liability for property damage has never been filed against Lapham-Hickey. Without a complaint, there is no 'suit.' And without a 'suit,' *** [insurer's] duty to defend Lapham-Hickey is not triggered.
***
Neither the initial letter from the EPA, the draft consent order nor the 'no-action' letter initiated a suit. None were filed in a court of law and none accomplished service of process upon Lapham-Hickey. Rather, the draft consent order and ultimately the 'no-action' letter were mechanisms used to encourage Lapham-Hickey to voluntarily investigate the contamination at the facility. Though the tone of these documents may have been confrontational, these documents by themselves are not complaints and do not impose liability." 166 Ill. 2d at 532-33.

■ In the case *sub judice*, defendants' duties to defend similarly apply to "suits" under the explicit language of both policies, "to defend any suit alleging such injury or damage" (Travelers' policy, coverage A, part I(a); Transportation's policy, coverage A, part I(a)). DEP never filed a complaint in court against FOTL or any of its subsidiaries. The only substantive difference between the present case and *Lapham-Hickey* is that DEP's letter expressly stated that it was an enforcement action whereas no enforcement action was initiated in *Lapham-Hickey*. 166 Ill. 2d at 525. In the instant case, however, Memphis notified FOTL's and Farley's attorneys that DEP's inspector did "not favor a Consent Order but preferred a letter from the State to the company indicating a Notice of Violation allowing a timetable for coming into compliance." Memphis' letter also indicated that the inspection which eventually brought about the letter was initiated by Universal itself. Further, DEP's letter describes itself as a "notice *** issued to formally require affirmation that the aforementioned PCB environmental contamination is completely and expedi[ti]ously removed and disposed in accordance with State and Federal PCB regulations." DEP's letter also stated that it was a "memorandum" and that Universal "should submit a written certified statement specifically describing the remedial actions to be taken."

As in *Lapham-Hickey*, DEP's letter did not initiate a suit, was not filed in a court of law and did not accomplish service of process upon Universal. DEP's letter, by its very terms, attempted only to encourage Universal to undertake remedial action. *Lapham-Hickey*, therefore, clearly controls the disposition of this issue.

DEP's letter did not initiate a suit and, therefore, did not trigger defendants' duties to defend.

B

■ FOTL contends that *Lapham-Hickey* should not be applied retroactively. In *Forest Preserve District v. Pacific Indemnity Co.*, 279 Ill. App. 3d 728, 734, 665 N.E.2d 305 (1996), the court noted that *Lapham-Hickey* had retroactive application because the supreme court's opinion in *Lapham-Hickey* did not state that it was prospective and the "opinion on its face applies to the litigants in the *Lapham-Hickey* case." It must be concluded that *Lapham-Hickey* is to be given retroactive application.

C

FOTL asserts, however, the circuit court's initial ruling of January 11, 1993, that a "suit" was commenced has become the law of the case because neither insurer appealed.

■ A decision on a question of law from which no appeal has been taken becomes the law of the case. *Wolfe v. Industrial Comm'n*, 138 Ill. App. 3d 680, 686, 486 N.E.2d 280 (1985). Contrariwise, a party cannot complain of an error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked in the circuit court cannot appeal from that judgment. *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386, 457 N.E.2d 9 (1983). It is the judgment and not what else may have been said by the circuit court that is on appeal. *Material Service Corp.*, 98 Ill. 2d at 387. A reviewing court is not bound to accept the reasons given by a circuit court for its judgment, which may be sustained upon any ground warranted, regardless of whether the circuit court relied upon such ground and regardless of whether the reason given by the circuit court was correct. *Material Service Corp.*, 98 Ill. 2d at 387.

■ Defendants here correctly observe that they did not need to appeal the lower court's judgment because no part of it was adverse to them. FOTL counters that Travelers did not receive attorney fees and, therefore, an aspect of the judgment was not in appellee's favor.[3] Travelers asserts that this court can affirm the circuit court's order on any ground.

The cases relied upon by FOTL (*e.g., Wolfe v. Industrial Comm'n*, 138 Ill. App. 3d 680, 686, 486 N.E.2d 280 (1985), *City of Chicago v. Industrial Comm'n*, 59 Ill. 2d 284, 290, 319 N.E.2d 749 (1974), and *City of Wilmington v. Industrial Comm'n*, 52 Ill. 2d 587, 289 N.E.2d

---

[3]FOTL does not allege, nor does the record reveal, that any part of the judgment was against Transportation. Transportation could not cross-appeal the circuit court's judgment, and the circuit court's ruling that a "suit" had been initiated did not become the law of the case as against Transportation in any event.

418 (1972)), involve instances where the party prevailing in the circuit court did not file a cross-appeal but nevertheless requested the reviewing court to reverse a part of the judgment. In the present case, Travelers does not seek to reverse any part of the circuit court's judgment. Travelers' counterclaim against FOTL requested attorney fees and costs. The circuit court granted Travelers and Transportation costs in its final order. No mention was made of attorney fees in either the final order or the court's last proceeding. Unlike the cases relied upon by FOTL, Travelers seeks only to affirm the circuit court's ruling. True, the circuit court, during the course of its January 1993 proceedings, found that a "suit" had been filed; however, the January 1993 order was subsequently vacated. Although FOTL accurately notes the circuit court retained its reasoning, that a suit had been filed in subsequent proceedings, nevertheless summary judgment was granted for Travelers and, therefore, there was no reason for Travelers to file a cross-appeal.

This court can sustain the circuit court's judgment upon any ground warranted, regardless of whether the circuit court relied upon such ground and regardless of whether the reason given by the circuit court was correct. *Material Service Corp.*, 98 Ill. 2d at 387. In any event, the decision in *Lapham-Hickey* controls the disposition of whether a "suit" was commenced by DEP's letter.

In sum, the issue of whether a "suit" had been filed did not become the law of the case because defendants did not have to file a cross-appeal where they do not seek to reverse any part of the circuit court's judgment.

## II

FOTL contends that defendants' pollution exclusions do not operate to bar coverage.

## A

■ FOTL initially argues that Transportation's pollution exclusion does not apply because FOTL did not "expect or intend" any discharge of PCBs into the external environment.

In *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 120-25, 607 N.E.2d 1204 (1992) (*OMC*), the supreme court discussed the identical pollution exclusion contained in Transportation's policies in the present case. The *OMC* court determined that the "sudden and accidental" language of the exclusion retriggers "coverage for unexpected or unintended releases" and discharges of pollutants. 154 Ill. 2d at 123-24. The *OMC* court observed that the relevant consideration "is whether the insured expected and intended to discharge *the particular toxic[ant] it is alleged to have discharged*

*and for which it now seeks coverage.*" (Emphasis in original.) 154 Ill. 2d at 129. In other words, if FOTL expected the release of PCBs into the environment, the pollution exclusion applies and the loss is not covered.

In the present case, the record demonstrates that FOTL regularly expected spills during the manufacturing process. In order to clean up the continually recurring spills and drippage, FOTL used "speedy dry," rags, mops and chipboard to absorb the oil. A study of the plant revealed "surface contamination" of the impregnation chamber, the basement beneath the chamber, the fluid transfer area, and "possibly the load testing area." Additionally, the "wood floors and timbers" beneath the impregnation chamber are "likely saturated with PCBs." The concrete floor in the basement similarly received "significant spillage, and is likely to be contaminated to a considerable depth with PCBs." This evidence sufficiently demonstrates that FOTL regularly experienced and endeavored to deal with discharges and releases of the PCBs. To claim that such discharges and releases were unexpected is disingenuous.

FOTL insists that because there is also evidence of accidental spills, they were "unexpected" and the policies do not bar coverage. Spills which occurred when "somebody forgot [accidently] to put a clamp on a chamber door" or when "a bottom clamp [accidently] was left open," were ordinary and recurring parts of the business, which also must be deemed to have been expected by FOTL in its operations. Compare *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.*, 938 F.2d 1423, 1429 (1st Cir. 1991) (rejecting insured's contention that some pollution was due to accidents because a company that "purposefully and regularly [has] been carrying on operations involving continual pollution" is not entitled to policy coverage), with *Nashua Corp. v. First State Insurance Co.*, 420 Mass. 196, 203, 648 N.E.2d 1272, 1276 (1995) (remanding for a determination of what portion of "pollution damage resulted from" ordinary operations (excluded), and what portion was caused by sudden and accidental releases (covered)). Despite evidence here of slight accidental spills, FOTL nevertheless is shown to have expected such accidents in the ordinary course of business and, therefore, remand is not necessary.[4] Transportation's pollution exclusion bars coverage in the present case.

___
[4]FOTL contends that other courts have consistently held that the standard pollution exclusion clause does not bar contamination arising from the unexpected and unintended release of materials from containment areas, relying upon *Patz v. St. Paul Fire & Marine Insurance Co.*, 15 F.3d 699 (7th

## B

■ FOTL next contends that Travelers' pollution exclusion does not apply. Travelers asserts that it has no duty to defend or indemnify plaintiff because the pollution exclusion bars coverage for the illegal contamination as well as for the expected and intended discharges of PCBs.

Travelers' policies contain a pollution exclusion which bars coverage for property damage arising out of any discharge of any liquid if such discharge results from "any condition in violation of or noncompliance with any governmental rule, regulation or law applicable thereto." Travelers' exclusion bars coverage, then, for any contamination which results from any condition in violation of any governmental law. The DEP's notice of violation stated that Universal violated several Connecticut statutes through its "illegal disposal of PCBs."

FOTL relies upon *Travelers Indemnity Co. v. Dingwell*, 414 A.2d 220 (Me. 1980), to establish that the pollution exclusion requires that the illegal conduct must cause the discharge. *Dingwell* is distinguishable because the complaint there did not "allege that *** [insured's] operation has ever been found to violate any state statute or regulation." 414 A.2d at 228. In *Dingwell*, it appeared from the complaint that insured's "operation conformed to the then existing law." 414 A.2d at 228. In the present case, DEP's letter plainly states that Universal violated state statutes. Although FOTL contends that "disposal" means "accidentally to discard" and that FOTL had to intend to discharge pollutants, Travelers' policy merely requires a violation of state statute or regulation. See *Travelers Insurance Co. v. Waltham Industrial Laboratories Corp.*, 722 F. Supp. 814, 828 n.6 (D. Mass. 1988), *aff'd in relevant part*, 883 F.2d 1092 (1st Cir. 1989). We conclude that Travelers' pollution exclusion expressly bars coverage for the contamination in the present case.

## C

FOTL next argues that Travelers' pollution exclusion does not apply because FOTL did not expect or intend to discharge pollutants. As previously discussed in section A of this part, evidence sufficiently

---

Cir. 1994) (applying Wisconsin law). *Patz*, however, is distinguishable because the manufacturer in *Patz* stored barrels of sludge in a pit which it covered. The pit was a "containing structure." In *Patz*, the insured sought to contain the sludge. Unlike *Patz*, the resulting contamination in the present case did not derive from the insured's attempts to conceal or contain the waste but arose from spills and drippage inside the plant. No one has suggested that the floor of the plant, unlike the pit in *Patz*, was a suitable container for PCB oil.

demonstrated that FOTL expected discharges and releases of the PCBs.

The pollution exclusion merely requires an expectation of release or escape of pollutants. Although FOTL also focuses on its stringent housekeeping, the evidence sufficiently shows that spills occurred commonly during the ordinary course of business. As a result, Travelers' pollution exclusion bars coverage in the present case.

## D

■ Travelers asserts that since it has no duty to defend under the pollution exclusion provisions of its policies, it has no duty to indemnify because an insurer's duty to indemnify is narrower than its duty to defend. FOTL maintains the duty to indemnify is separate from the duty to defend.

In cases where no duty to defend exists, there is no duty to indemnify since the duty to defend is broader than the duty to indemnify. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 398, 620 N.E.2d 1073 (1993). Because we conclude that Travelers has no duty to defend FOTL, concomitantly it has no duty to indemnify FOTL.

For the reasons set forth in this opinion, we affirm the decision of the circuit court granting summary judgment in favor of Travelers Indemnity Company and Transportation Insurance Company.

Affirmed.

SCARIANO and DiVITO, JJ., concur.